# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| | * | |
| | * | **Criminal Case No.: SAG-22-336** |
| **v.** | * | |
| | * | |
| **ANNA GABRIELIAN & JAMIE LEE** | * | |
| **HENRY,** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

Cases prosecuted under novel legal theories often present novel problems for the trial court. This case is no exception. The Defendants, Anna Gabrielian and Jamie Lee Henry, are physicians. The Government alleges that in 2022, the Defendants disclosed, to an undercover agent they believed to be a Russian government operative, medical records pertaining to U.S. government employees or their family members. After considering the facts, the Government did not charge these Defendants with any offenses relating to attempted treason or espionage. Instead, as far as this Court is aware, this is the first case in which the Government has ever charged this particular felony violation of the Health Insurance Portability and Accountability Act ("HIPAA"), citing, in part, the Defendants' alleged intent to cause "malicious harm" to the U.S. Government.[1]

---

[1] This Court is aware of a few other cases charging a felony HIPAA violation accusing the defendant of disclosing individually identifiable health information "for personal gain." Those cases presented a more common set of facts: employees of medical offices co-opted and sold health information from their workplaces to persons intending to use the information to further fraud or identity theft schemes.

Defendants' initial appearance in Court occurred about twenty months ago. Following the first trial of the charges, which ended in a hung jury, this Court ruled that the Government had failed to adduce sufficient evidence that the Defendants intended any "malicious harm" to the specific individuals whose health information they disclosed to the undercover agent. The uncontroverted video evidence at the first trial showed that the undercover agent specifically asked the Defendants to produce "five" or "a few, at least" medical records that were not for "anyone really important or anyone whose medical information is guarded by some kind of special means."[2] The Defendants revealed a few relatively inconsequential records (in terms of the nature of the medical information contained), which would be of no evident use to any foreign government. Following this Court's ruling granting a motion for judgment of acquittal on that subset of the "malicious harm" charges, ECF 180, the remaining theories of prosecution are (1) that the Defendants intended "malicious harm to the United States" because they produced the health records in an effort to ingratiate themselves with the Russian government to provide unspecified future assistance; and (2) that the Defendants produced the health records for "personal gain," not because they sought or obtained any money or property, but because they wanted to secure the trust of the perceived Russian operative and the ability to provide future assistance to the Russians.

While this case is highly unusual in its charges, its facts, and the degree of public interest it has engendered, it remains subject to the same constitutional and statutory provisions that govern every criminal prosecution in this country. The Bill of Rights appended to the U.S. Constitution protects citizens' individual rights and fundamental liberties against government infringement. In relevant part, the Sixth Amendment specifies, "[i]n all criminal prosecutions, the accused shall

---

[2] These quotations come from video transcripts that the parties jointly agreed to admit as trial exhibits during the initial trial.

enjoy the right to a speedy and public trial." U.S. CONST. amend. VI. Almost two hundred years after the Bill of Rights was ratified, in 1974, Congress enacted the Speedy Trial Act, which sets forth mandatory time limits and specified exclusions to ensure a more uniform enforcement of defendants' longstanding speedy trial rights. 18 U.S.C. § 3161 *et seq*. As the U.S. Court of Appeals for the Fourth Circuit recently emphasized, Congress wrote the Speedy Trial Act to leave no room for trial judges' exercise of discretion. *See United States v. Hart*, 91 F.4th 732, 740–41 (4th Cir. 2024). If the Speedy Trial Act's dictates have been violated and the Government has not afforded a defendant a speedy trial, even in the absence of any Government malfeasance, all affected criminal charges must be dismissed. Without exception.

As set forth below, this case now presents in that posture. Both Defendants made in-court motions seeking relief under the Speedy Trial Act during a status hearing on May 6, 2024. The time allowed for bringing this case to trial under the Speedy Trial Act has expired and the parties failed to ask this Court to make the specific findings required to exclude time from the Speedy Trial Act calculations. Pursuant to *Hart* and the express language of the Speedy Trial Act, this case must be dismissed. Where dismissal is required, the Speedy Trial Act prescribes several factors this Court must weigh to determine whether the dismissal should be with or without prejudice. 18 U.S.C. § 3162(a)(2). In this case, the Government's excessively expansive view of its authority under the Classified Information Procedures Act ("CIPA") contributed to its neglect of its responsibility to afford the Defendants a speedy trial and ended in consequential prejudice to both Defendants. Six months have passed since this Court postponed the retrial to permit the Defendants to pursue CIPA discovery. Because of the Government's decision to maintain "radio silence" with this Court, this Court was unaware of the Government's unilateral determination, months ago, that such discovery should not take place. As a result, this case has not advanced towards its retrial in

any meaningful way in half a year. As this Court explains below, consideration of the relevant and statutorily specified factors leads to the conclusion that dismissal with prejudice is the only viable option to effectuate the purposes underlying the Speedy Trial Act, including to deter future such government neglect, alleviate the prejudice to these Defendants, and ensure the fair administration of justice. Accordingly, for the reasons set forth below, Defendants' Speedy Trial Act motions must be granted and the charges in this case will be dismissed with prejudice.

## I.      Procedural History and Relevant Facts

The procedural history of this case is lengthy, and the facts are convoluted. Nevertheless, this Court believes a comprehensive recitation of the facts, including the various exchanges between the parties, is required to permit a fair evaluation of the factors enumerated in the Speedy Trial Act.

On September 28, 2022, a federal grand jury returned an indictment charging Dr. Anna Gabrielian and Dr. Jamie Lee Henry (collectively, the "Defendants") with conspiracy in violation of 18 U.S.C. § 371, along with multiple counts of Disclosure of Individually Identifiable Health Information ("IIHI") in violation of HIPAA, 42 U.S.C. § 1320d-6. ECF 1. The "object of the conspiracy" defined in the indictment was:

> to provide IIHI related to patients at Fort Bragg and Medical Institution 1 to an individual that GABRIELIAN and HENRY believed to be working for the Russian Government, in order to assist the Russian government by demonstrating: 1) the level of GABRIELIAN and HENRY's access to IIHI of U.S. personnel, 2) GABRIELIAN and HENRY's willingness to provide IIHI to the Russian government, and 3) the potential for the Russian government to gain insights into the medical conditions of individuals associated with the U.S. government and military, to exploit this information.

ECF 1 ¶ 8. The person that the Defendants allegedly believed to be working for the Russian Government was an undercover agent for the U.S. Government. Both Defendants appeared in court on September 29, 2022, and were released on 24/7 home detention with permission to leave their

home only for certain specified activities. ECF 10, 12. The arrests received extensive local and national media coverage in news outlets, including NBC, CNN, CNBC, and CBS, among others.

While the original charges in this case consisted only of HIPAA and HIPAA conspiracy violations, from the outset, the Government acknowledged that certain classified material and procedures would be at issue. Initially, the Defendants took the position that they did not want to avail themselves of the procedures set forth in CIPA, 18 U.S.C. app. 3, because of the time-consuming nature of those procedures and the need, in particular, for defense counsel to obtain security clearances to participate in the process. Instead, Defendants prioritized their ability to have the case tried on a more expedited schedule and agreed to work with Government counsel to find evidentiary "work-arounds" to avoid the need to obtain classified material and engage in the array of hearings and procedures CIPA requires.

Because of certain issues relating to discovery, on January 24, 2023, the Government filed a motion for appointment of a Classified Information Security Officer, which this Court granted on January 25, 2023. ECF 34, 36. Based on its understanding of the case at the time and the absence of any defense requests to obtain classified information, this Court also granted a motion for protective order pursuant to CIPA Section 4 on February 1, 2023, which had the effect of eliminating the Government's burden to produce certain classified information in discovery. ECF 38, 39. During those early stages of the proceedings leading up to the Defendants' first trial, all parties consented to, and this Court granted motions seeking, multiple exclusions of time pursuant to the various provisions of the Speedy Trial Act. ECF 21, 35.

Following the eight-day jury trial, the jury deadlocked on all charges and this Court granted a mistrial on June 1, 2023. ECF 118. The Government determined that it would retry the case against both Defendants, and after conferring with counsel regarding the schedule, this Court

entered an order scheduling the retrial for November 27, 2023. ECF 129. Again, the parties agreed to, and submitted a motion requesting, an exclusion of time under the Speedy Trial Act through the commencement of the November trial. ECF 155. In the interim, the parties engaged in extensive motions practice regarding the motions for judgment of acquittal the Defendants had made during the first trial. ECF 142, 144, 145, 147, 151, 153, 154, 157, 160.

On November 13, 2023, this Court held a pretrial conference and motions hearing. ECF 183. During that hearing, this Court granted in part and denied in part Defendants' motion for judgment of acquittal and also heard argument on a number of motions *in limine* filed by both sides in anticipation of the retrial. ECF 188. During the course of that hearing and the discussion of certain relief sought by Defendants, the issue of classified information came to the forefront. It became clear that, once Defendants had seen how the Government employed the national security aspects of the case during the first jury trial, Defendants believed certain classified information would be material to their defense. In particular, in response to a defense argument regarding testimony about the efforts of intelligence agencies to obtain medical information, Assistant United States Attorney ("AUSA") Aaron S.J. Zelinsky from the U.S. Attorney's Office for the District of Maryland ("Maryland USAO") noted that "this is not a CIPA proceeding at this point," ECF 188 at 40:23. He continued, "to the extent that the argument from the defense is 'Well, we haven't seen evidence that medical records are a target of foreign intelligence services, and we would like information as to why medical records of individuals are targets of foreign intelligence services,' that sort of is a core CIPA matter." *Id.* at 41:7–12. Defense counsel responded that he did not "want an FBI agent or a stipulation about open source stuff," noting that he believed the defense was entitled to review classified information on the issue and that he would "have to talk to my client at this stage about whether she really wants to waive that right to review." *Id.* at 42:14–23. AUSA

6

Zelinsky stated, "As this Court knows, this Court has CIPA proceedings in other cases, there's a number of steps. It's not that we're going to file a motion and waive a wand and [defense counsel] gets to go sit at the CIA and rummage about. Once the CIPA proceeding is initiated, counsel has to get clearances. Once counsel has clearances, we have to seek authority to be able to use certain information." *Id.* at 43:9–15. After further discussion, AUSA Zelinsky represented, "Insofar as this is now an eleventh hour request for a security clearance, the Government can accommodate that, but it's going to take some time and we just need to know." *Id.* at 49:12–14.

After a break to confer with their clients, defense counsel stated, "Our clients do not want to delay the trial. I want to make that really clear. I think we've behaved pretty consistently. We want to go as fast as we can; their lives are on hold." *Id.* at 50:12–15. But defense counsel proceeded to explain their defense theory, which hinged on the absence of any evidence that a foreign intelligence agency had ever sought medical information to compromise an official. *Id.* at 52–58. After some discussion about the usefulness of the requested information and the anticipated difficulty in obtaining it, the Court stated:

> If it's information you would like to have, that's fine and if we want to go through the process of trying to obtain it which is going to delay the trial, we can do that. I don't think that what you would get at the end of that process would be the type of conclusive, coherent set of information that perhaps you would like to see because I just don't see how the government would even begin to search for this information, nor do I think it's necessarily kept in that manner.

*Id.* at 58:11–18. The Court continued saying that if this topic was important for the defense to establish, then the trial should be postponed. As the Court described, "Then we go through the security process and we ask them to do that search. If that's information you think you have to have for the defense, that's a viable option here." *Id.* at 59:7–11. The Court continued, "But I think that puts us back where we were before the break which is that then we need to go down the CIPA route, and we get what we get from the CIPA route which may be helpful to you-all, may not be.

We just don't know what we're going to get. But if it's that fundamental of a point that you wish to be able to raise, I want to be very clear that we are not in any way preventing us from going down that path; then we postpone the trial, we do the security clearances." *Id.* at 61:9–16. In response, AUSA Zelinsky confirmed, "The Court has accurately summarized the situation. We apply for defense counsel for security clearances. The Government undergoes – as this Court knows, there are multiple stages to the CIPA process. We have from the beginning of this trial been willing to do that. We have repeatedly expressed to defense counsel that if they wish to get clearances, we would move to facilitate that as we do in every case. This was not defense counsel's request." *Id.* at 61–62. Defense counsel then asked for twenty-four hours to make a decision about whether to postpone the pending trial to pursue CIPA, stating, "The problem here is a very practical one. The defendants face great financial restraints and that increases with every day." *Id.* at 62.

Within twenty-four hours, on November 14, 2023, defense counsel advised the Government and the Court, via email, that both Defendants "request to invoke CIPA procedures and postpone trial as a result." ECF 194-1 at 5. The Government responded to defense counsel and this Court by stating, "We will work to initiate the process of the security clearance application procedure for you and your co-counsel." *Id.* That same date, Government counsel emailed defense counsel asking:

1. Please confirm you consent to a Speedy Trial Act waiver to the date of the court's status update in six months.
2. We will be in touch about paperwork for clearances – as you know it's not in our power to grant such clearances or approve your suitability and need to apply for them. It is our expectation that at most clearances will be granted to only the two of you.
3. It would be helpful therefore to confirm that you seek information regarding whether:
   (a) private health information of individuals has been previously sought by our own and/or other foreign governments.
   (b) whether private health information has been or could be used by our own or foreign governments

      (c) evidence of activities of the Russian intelligence network to harm people
          in the United States.
If this summarizes the information you seek, please confirm.

ECF 194-1 at 3–4.

On November 15, 2023, defense counsel emailed Government counsel with the caption

"following up on docketing our Speedy Trial Waiver re: CIPA" and said:

> In thinking through the notice we will file to follow up on the Court's direction (and
> our email exchange earlier today) in order to formalize on the docket the invocation
> of CIPA and our understanding that the trial will be postponed, it seems to me the
> (h)(7)(A) (ends of justice) Speedy Trial Act waiver is the appropriate basis to cite
> (with findings) and I also think here (h)(1)(D) (pending motions) would be
> appropriate as well since part of the motion taken up the other day is being reserved
> to see where we are on the issues after the CIPA process is completed.
>
> Assuming those are the waiver bases cited, I just wanted to ascertain the
> Government's position or I can say nothing about the Government's view if you
> prefer. I can just make it an (h)(7)(A) basis if you prefer.

ECF 205-1 at 2. AUSA Zelinsky responded:

> Ordinarily in our district the government takes care of the Speedy Trial Act waiver
> (there's a motion and proposed order we use that we filed earlier in this case that
> has a number of findings, including (h)(7)(A). I think the easiest thing is just a
> notice regarding your intent to seek security clearances and belief that there's
> potential CIPA litigation as discussed. Then we will take care of the STA.
>
> That said, if you feel the need, you are welcome to use (h)(7)(A) and say we don't
> oppose the STA motion. Ordinarily we do it is [sic] as a separate motion with a
> proposed order and findings.

*Id.* at 1–2. Defense counsel immediately replied, "Ok. Good to know. Thanks. I think I'd like to

include the Speedy Trial Act waiver in the notice on CIPA mainly because my sense was the judge

wanted us to acknowledge it. Her email included asking for a confirmation on it. I could be

misreading that but it seems to me in good faith we should do it **and then you do your separate**

**filing if that is protocol and it all should be covered.**" *Id.* at 1 (emphasis added). Government

counsel responded the next day, "We have no objection to including that information, and you can

say we have indicated that we don't oppose tolling of the STA." *Id.*

On November 16, 2023, Defendants filed their "Notice re: CIPA and Speedy Trial Act,"

ECF 184, ("the Notice"), which read in relevant part:

> 1.     It has become clear to the undersigned counsel and to Defendants that, for
> a number of reasons, in order to secure the Defendants' rights under the 5th and 6th
> Amendments to the United States Constitution in this case, it is necessary to engage
> the Classified Information Procedures Act, Pub. L. 96-456, 94 Stat. 2025, 18 U.S.C.
> App. 3 §§ 1-16 ("CIPA") and for the Act to play a role in the case going forward.
> 2.     To that end, defense counsel will coordinate with Government counsel to
> obtain security clearances as expeditiously as possible and to proceed in that
> manner pursuant to the Act's provisions.
> 3.     Defendants understand and agree that this development requires a
> postponement of the trial date previously scheduled to begin on November 28,
> 2023, to a future date that cannot yet be determined. The Defendants agree that an
> initial period of six (6) months' delay in order to pursue relevant matters through
> CIPA procedures is reasonable and hereby agree that such six (6) months period
> ought to be excluded under the Speedy Trial Act, 18 U.S.C. § 3161.
>
> Specifically, Defendants respectfully submit, subject to the Court's assessment, of
> course, that such time period should be excluded under 18 U.S.C. § 3161(h)(7)(A),
> based on a belief that the ends of justice served by the granting of such continuance
> outweigh the best interests of the public and the Defendants in a speedy trial, and
> after a consideration of the relevant factors under 18 U.S.C. § (h)(7)(B) [sic].
> Government counsel has authorized the undersigned to represent to the Court that
> the Government agrees that this section of the Speedy Trial Act justifies a six (6)
> months continuance and the exclusion of this six (6) months period from the time
> calculation under the Act.[3]

---

[3] The Notice contained additional language stating, "Defendants also believe that, given the
unresolved status of certain unresolved pre-trial motions issues discussed during the Status
Conference, the six (6) months time period also is properly excludable under 18 U.S.C. §
3161(h)(1)(D)." ECF 184. That subsection permits exclusion of time from the filing of a pretrial
motion "through the conclusion of the hearing on, or other prompt disposition of, such motion."
*Id.* Defendants' counsel confirmed during the May 6, 2024, hearing that this portion of the Notice
was in error, as this Court's orders of November 14, 2023, disposed of all pending pretrial motions.
ECF 179, 180. Thus, § 3161(h)(1)(D) provided, and still provides, no basis for excluding any time
from Speedy Trial calculations between November 14, 2023, and the present. Government
counsel's current effort to invoke § 3161(h)(1)(D) by arguing that the Notice itself constituted a
motion that remains pending is unavailing. *See* ECF 205 at 1 n.1. The Notice is not a motion for
the reasons set forth above.

ECF 184. The Notice was not captioned as a motion, did not detail the factors or authorities relevant to an ends-of-justice finding in these circumstances, and did not attach a proposed court order, as required for filing motions in this Court. *See* Loc. R. 105.1 (D. Md. 2023) (requiring that any motion "be accompanied by a memorandum setting forth the reasoning and authorities in support of it and a proposed order"). The Clerk's Office properly docketed the filing as it was captioned, as a notice, not a motion. Because the Notice was not a motion, no court ruling ensued. The Government did not file anything separately regarding the Speedy Trial Act.

Instead, five days passed, and defense counsel received no paperwork from the Government. On November 21, 2023, defense counsel emailed AUSA Zelinsky, "Just following up re the status of our security clearance paperwork. Also, your below message said that you expect only 'two' clearances will be granted. I assume you meant to say 'three' clearances (for Chris, David, and me). We are still working on finalizing a list of information we would hope to receive through the CIPA process and will get that to you shortly." ECF 194-1 at 3. AUSA Zelinsky promptly responded:

> We cannot make any requests for clearances – or even seek a determination from the relevant stakeholders if they are necessary – until we receive the request from you for information. That's why I immediately emailed with the request below. Such a request triggers the process and indicates a possible need to know. We cannot just ask for a clearance ourselves. That's not how the process works.  I did not mean to say three. Clearances can be expensive and time-consuming for the government. Again, the decision is not up to me, but I do not expect more than one counsel for each defendant to receive a clearance.

*Id.* at 2–3. Later that day, defense counsel sent an email stating, "Please make the request for three clearances. We want to get the ball rolling on this." *Id.* at 1. The email also itemized a list of seventeen items or categories of classified information that the defense sought to obtain (the three that had been listed by the Government in its email, plus fourteen others). *Id.* at 1–2. Defense counsel further noted, "our firm has multiple matters involving CIPA where the government

11

helped facilitate multiple clearances for attorneys and paralegals." *Id.* AUSA Zelinsky responded on November 21, 2023, "We will request three clearances. As I'm sure you know from your firm's prior work, this is not a fast process. But we'll keep you up aware [sic] as things progress." *Id.* at 1. Neither party filed a Speedy Trial Act motion and this Court issued no order relating to the exclusion of time. However, this Court entered the following paperless order on November 21, 2023:

> CONFIRMING that the trial set for November 28, 2023 is cancelled in light of the defendants [sic] decision to pursue possible discovery protected by the Classified Information Procedures Act.  The parties are to provide the Court with a status report on the security clearance process on or before May 21, 2024.

ECF 185.

Sixteen more days passed, and defense counsel heard no word from the Government. On December 7, 2023, defense counsel inquired, "We haven't heard anything about getting the security clearance process started. Can we please get an update?" ECF 194-2 at 1. Government counsel responded, "We are in discussions regarding your requests. I expect we will have some follow up questions surrounding your discovery requests prior to beginning any clearance process, since your requests are significantly broader than we had originally anticipated given your prior statements. We'll be back in touch as soon as we can." *Id.*

Almost two months (fifty-one additional days) passed, and defense counsel still heard no word from the Government. On January 27, 2024, defense counsel again inquired:

> Our clients reluctantly agreed to delay trial on the Government's representation that it would implement CIPA procedures to resolve issues over Defendants' requests for exculpatory information, or to exclude certain government arguments. It's been more than two months, and the government still hasn't even initiated the process to get security clearances for defense counsel. Please let us know what's going on, and provide a timetable for a government response to our requests.

ECF 194-3.

Six more days passed (making a total of seventy-three since the defense discovery requests were made), and defense counsel still heard no word from the Government. On February 2, 2024, after some email exchanges between the Maryland USAO and the National Security Division ("NSD") of the U.S. Department of Justice ("DOJ") on February 1, 2024, the Maryland USAO responded to defense counsel and suggested scheduling a conference call to "review" the Defendants' November 21, 2023, requests. ECF 195 at 13. That telephone conference, which only lasted about one hour, occurred on February 5, 2024, seventy-six days after Defendants sent their discovery requests to the Government. *Id.* at 13. Sometime after that call, the NSD informed the Maryland USAO "that the position of the United States was that there were not relevant and discoverable records to which the defendant [sic] was entitled, and therefore moving further in the security clearance process was not required in this [sic] circumstances." ECF 199 at 6.

After the February 5, 2024, telephone conference, despite the communication between the NSD and the Maryland USAO establishing the Government's position, another sixteen days went by and defense counsel heard no word from the Government. On February 21, 2024, the Government emailed to ask for a second telephone conference. ECF 195 at 13. That second conference occurred on February 22, 2024, and included defense counsel, AUSA Zelinsky, and an attorney from NSD. *Id.* During that call, "the Government discussed that it believed many of the concerns raised by the defendant [sic] – in particular the use and utility of medical records to foreign adversaries – could be addressed by unclassified testimony of an expert, and that the Government would work to notify the Defendant [sic] when such an expert had been identified." ECF 199 at 6. According to defense counsel, during that call, Government counsel also represented that they would draft a status report identifying issues they believed appropriate to take up with the Court and would email it to defense counsel for review. ECF 195 at 14.

Another sixteen days elapsed, and defense counsel heard no word from the Government.

On March 10, 2024, defense counsel emailed the Maryland USAO and said:

> Our client's [sic] lives are on hold. It has been five months since we reluctantly invoked the CIPA process at your suggestion. Despite saying you would immediately start the process for getting defense counsel security clearances, you never did so. We had a conference call on February 22, and you promised to send us a written proposal intended to provide the Court with some sort of status report on CIPA issues and a framework for the issues we could not agree on, and therefore would be the subject of defense motions. We still don't have your draft. . . . We hope to file something with the Court this week. We would prefer to incorporate your draft/response. Please let us know a date certain when you will provide your draft.

ECF 194-4 at 4.

That same day, the Government responded, "We are in the process of finalizing our expert on the matter we discussed at the core of many of the issues relating to the interest in medical records by foreign governments (and our own) . . . . We propose providing you a draft by end of week with information about our expected expert. We will then await your response." *Id.* at 3. On March 11, 2024, defense counsel responded, stating, "My initial thought is that designating an expert will only amplify the need for the Government to produce contrary information, classified or not." *Id.* at 2. The Government replied, that same day:

> As we discussed we would produce information that contradicted our expert if we had it. We do not have such information and have no reason to believe it exists.
>
> We will provide a full draft. My instinct now is to inform the Court that (1) We have been consulting as directed to by the Court (2) The Government does not believe security clearances are needed for counsel; and (3) Counsel for the defendants plan to file additional motions regarding this matter. Do you think we should include more?

*Id.* at 2.  Defense counsel responded, "On behalf of both defendants . . . [w]e disagree that this process has followed what the Court directed or the Government said would happen. We will file our own motions/report with the Court." *Id.* at 1.

Another four days went by with no word from the Government. On March 15, the Government emailed defense counsel:

> As discussed, we are providing the name of our intended expert. This is not a formal expert disclosure **since no trial dates have been set by the Court** but rather a good faith attempt to give you the information we have put together in response to your questions.
>
> At this point, we plan to call Rose McDermott of Brown University. Professor McDermott does not have a security clearance and we believe has never possessed a clearance. We anticipate she will testify about how private health information of individuals has been previously sought by our own and/or other foreign governments, and how private health information has been or could be used by our own or foreign governments. Once we have her formally under contract **we plan to produce a more fulsome summary for you on a litigation timeline.**
>
> As discussed, our understanding is that you will file a separate status with the Court. As we also discussed, our plan is to file a standard Speedy Trial Act motion with the Court as is our usual procedure (we understand you have already filed one when you made your initial request for discovery – ours will be in addition and is just our regular policy). David has consented to an exclusion through May 1. Chris: you were going to check and consent. Can you confirm your consent?

ECF 194-5 at 3 (emphases added).

Another nineteen days went by and defense counsel heard no word from the Government.

On April 3, 2024, defense counsel wrote to Government counsel stating:

> In the March 10 email below you promised a more fulsome expert witness disclosure. The email below [from March 15] falls far short of the requirements for an expert witness disclosure, and does not provide any guidance in terms of how this potential expert would resolve the issues that led us to reluctantly ask for a postponement to pursue CIPA information. Please let us know when you plan to make an expert disclosure.

*Id.* at 2. The Government responded, that same day:

> We did not intend the below as our formal expert disclosure as I noted at the time I sent it. As we indicated below, **we plan to provide a more complete disclosure when we have received a timeline for the Court for such disclosures**. In the interest of narrowing (or resolving) CIPA issues, we made the disclosure below. We believe they are adequate for determining which issues you have identified that our expert will speak to, and therefore which can be disposed of without any need for any discussion of any potential classified information.

As I stated, we anticipate she will testify about how private health information of individuals has been previously sought by our own and/or other foreign governments, and how private health information has been or could be used by our own or foreign governments.

We believe this will address items 9 and 120 [sic] of your initial request, which I have appended below:

9. Documents related to whether private health information of individuals has been previously sought by our own and/or other foreign governments
10. Documents related to whether private health information has been or could be used by our own or foreign governments

I believe we have a continuing disagreement about item 1: Any call to the Russian Embassy if such recordings were to exist.

We do not believe that there is relevant information regarding items 11-13, which we have previously stated are overbroad.

11. Evidence of, or reports related to, activities of Russian intelligence network to harm people in the United States
12. All preventative measures taken to prevent Russian intelligence from causing harm in the United States
13. All documents reporting a concern that Russian intelligence may cause harm in the United States

We believe we have turned over any relevant information related to the other requests.

. . . .

David also noted on behalf of both clients on March 11 that you intended to file your own status with the Court. We continue to believe a joint status laying out our areas of disagreement would be best for the Court, and are happy to try to draft such a status again if helpful.

*Id.* at 1 (emphasis added).

Other than a series of consent motions seeking to modify the Defendants' conditions of release, this Court heard nothing from either party (on the topics of CIPA or security clearances or expert witnesses or the Speedy Trial Act) during the 155-day span between the entry of its paperless order on November 21, 2023, postponing the retrial and April 25, 2024. On April 25,

16

2024, and on April 26, 2024, the Defendants each filed unilateral status reports informing this Court that, contrary to the Court's understanding that the security clearance process was underway, the Government had never sent the forms to defense counsel to begin the process. ECF 194, 195.

This Court promptly scheduled an in-court hearing on May 6, 2024, to discuss the situation, ordering that the "parties should come prepared to discuss (1) whether this case is now subject to dismissal under the Speedy Trial Act, because the Government did not adhere to its representations on which the Defendants' consent exclusion of time (and this Court's deferral of the trial date) was premised; and (2) whether any such dismissal, if it occurs, should be with or without prejudice." ECF 197. On the evening of Friday, May 3, 2024, before the morning hearing scheduled for Monday, May 6, 2024, the Government filed a letter brief in which it informed this Court, for the very first time, that "the Department of Justice determined that there was no classified information to which the defendant [sic] was entitled, and therefore it would be a waste of time and resources to clear the defendants' counsel." ECF 199 at 7. It further alleged:

> The Government moved expeditiously to initiate the security clearance process. It promptly notified the Defendants **when there was a determination that the process had come to an end because there was no relevant information to which the defendants were entitled**. . . . The Government passed on the defendants' attorneys' request for clearances. The requests were denied. The case should now proceed to trial.

*Id.* at 8 (emphasis added).

At the May 6, 2024, hearing, both Defendants formally moved for dismissal pursuant to the Speedy Trial Act. This Court expressed its grave concerns regarding the Government's handling of the matter since its last hearing on November 13, 2023, and expressly suggested that the Government start the background investigations of defense counsel while awaiting this Court's ruling on the speedy trial motions. Just hours later, also on May 6, 2024, AUSA Zelinsky filed a letter stating, "At 5:48PM this evening, each defense counsel received via email a participant

request form for the National Background Investigation System (NBIS), the platform used by the federal government to process security clearance applications." ECF 200.

This Court subsequently ordered the Government to submit a chronology of the case-related contacts between the Maryland USAO and the NSD. ECF 201. The Government's chronology reflected email communications on November 14, 2023, and on the day of the defense requests on November 21, 2023, then no further email communication until February 1, 2024. ECF 205-2. There is one email from the Maryland USAO to the NSD on February 8, 2024, and a series of emails exchanged between February 20-22, 2024. *Id.* There is then no additional email contact between those agencies about this case until the date of this Court's speedy trial hearing, May 6, 2024, after which defense counsel promptly received the security clearance applications. *Id.* The Government could not produce records of any telephonic contacts between the Maryland USAO and the NSD because they were not maintained, but represented, "the Government states that counsel believe they contacted the National Security Division by telephone to discuss this matter in at least November and December, 2023, and February and May, 2024." ECF 205 at 2.

## I.    Legal Standards

Because the complex situation in this case involves two statutes, CIPA and the Speedy Trial Act, this Court will review each statute's dictates in turn.

### A.  CIPA

Congress enacted CIPA to prevent the unnecessary or inadvertent disclosures of classified information and to advise the government of the "national security cost" of proceeding with a criminal prosecution. *See United States v. Mallory*, 40 F.4th 166, 174 (4th Cir. 2022) (quoting *United States v. Pappas*, 94 F.3d 795, 799 (2d Cir. 1996)); *United States v. Fernandez*, 887 F.2d 465, 469 (4th Cir. 1989) (identifying the "cost of national security disclosure"). Specifically, CIPA

provides procedures under which the Court advises the Government of the scope of the classified information that must be disclosed to the defense in discovery or used in the course of the trial. Those court rulings essentially establish what can be called the "national security cost" of the prosecution. Importantly, the fact that classified information might be involved in a criminal case "neither adds to nor detracts from the substantive rights of the defendant or the discovery obligations of the government." U.S. Dep't of Just., Crim. Res. Manual § 2054-I (1997).[4] A defendant remains entitled to full discovery and to present his defense to the charges whether the case involves national security information or not. However, recognizing that the Government might conclude, in some instances, that the protection of classified information is more important than the prosecution of a particular case, CIPA provides a mechanism for "the sovereign to know in advance of a potential threat from a criminal prosecution to its national security." *Id.* In other words, CIPA's various sections provide a series of checkpoints where the Government can learn from the Court what the "national security cost" of the next step will be, can avail itself of an interlocutory appeal if it disagrees with the Court's conclusions, and can determine, if the "national security cost" is too high, that its prosecution should be narrowed or even terminated to protect national security interests.

To understand what transpired in this case, a review of CIPA's pertinent sections is warranted. Section 1 simply defines the terms "classified information" and "national security." 18 U.S.C. app. 3 § 1. Section 2 provides that "[a]t any time after the filing of the indictment or information, any party may move for a pretrial conference to consider matters relating to classified

---

[4] It appears to this Court that the DOJ no longer uses this version of the Criminal Resource Manual. However, because the DOJ has not yet published a revised version of this manual, and its other publications do not provide the same detailed CIPA guidance, the Court finds the prior version helpful in its analysis here. There is certainly no indication that the basic legal principles described in the manual have been abandoned.

information that may arise in connection with the prosecution." *Id.* § 2. Essentially, the Section 2 conference "kicks off" the CIPA proceedings with a discussion between the parties and the Court regarding the scope of the confidential information at issue. Section 3 requires the Court, upon the request of the Government, to issue an order "to protect against the disclosure of any classified information disclosed by the United States to any defendant in any criminal case." *Id.* § 3. The DOJ's Criminal Resource Manual described Section 3 as "an excellent opportunity to begin educating the Court, including the judge's staff, about CIPA and related issues." U.S. Dep't of Just., Crim. Res. Manual § 2054-I.C (1997). The Section 3 order also included "the appointment by the court of a Court Security Officer." *Id.*

Section 4 provides that "the court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove." 18 U.S.C. app. 3 § 4. The Court's denial of a request to use alternative measures in the production of discovery is subject to interlocutory appeal. *Id.* § 7(a).

Once the scope of appropriate pretrial discovery has been adjudicated through Sections 2-4 and classified discovery has been provided to defense counsel in accordance with the Court's rulings, Sections 5 and 6 govern the handling of classified information at trial. Section 5(a) requires a defendant who reasonably intends to disclose or cause the disclosure of classified information to provide timely pretrial written notice of his intention to the Court and the Government. *Id.* § 5(a). Upon the Government's request, Section 6(a) then requires the Court to hold a hearing and "make all determinations concerning the use, relevance, or admissibility of classified information that

20

would otherwise be made during the trial." *Id.* § 6(a). The Court is required to state in writing the reasons for its determination as to each item of classified information. *Id.*

If the Court rules certain classified information to be admissible, Section 6(c) permits the Government to propose unclassified "substitution[s]" for the information, which can include redactions, stipulations, or summaries. *Id.* § 6(c)(1). The Court grants substitutions where the "statement or summary will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." *Id.* Once again, if the Court declines to accept a substitution proffered by the Government, the Government is permitted to take an interlocutory appeal under Section 7. *Id.* § 7. If the issue is resolved against the Government, the Attorney General is permitted to file an affidavit effectively prohibiting the use of the contested classified information. *Id.* § 6(e)(1). If that occurs, the Court may impose sanctions against the Government, ranging from evidentiary rulings to dismissal of all or part of an indictment. *Id.* § 6(e)(2).

Essentially, the various sections of CIPA provide the Government with a number of "off-ramps" in the event that the Court makes unfavorable rulings regarding the classified evidence that needs to be disclosed. The Government, of course, is always free to dismiss criminal charges or to narrow the scope of the evidence it intends to present if the "national security cost" of a given prosecution proves too great.

### B.  Speedy Trial Act

The Speedy Trial Act provides, in relevant part, "In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days . . . from the date the defendant has appeared before a judicial officer of the court in which such charge is pending." 18 U.S.C. § 3161(c)(1). In

reality, however, there are a number of exclusions set forth in 18 U.S.C. § 3161(h), such that few cases actually progress to trial within a seventy-day window. Relevant to this case, 18 U.S.C. § 3161(h)(7)(A) allows for the exclusion of:

> any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

The Speedy Trial Act leaves this Court no discretion as to whether criminal charges can proceed if its dictates have been violated: "If a defendant is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h), the information or indictment ***shall be dismissed*** on motion of the defendant." 18 U.S.C. § 3162(a)(2) (emphasis added).

If such dismissal occurs, Congress specified three factors that a court shall consider, "among others," when considering whether the dismissal should be with or without prejudice: "the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice." *Id.* In *United States v. Taylor*, the Supreme Court advised that "the presence or absence of prejudice to the defendant" is another factor that is relevant to this inquiry, though not dispositive. 487 U.S. 326, 333–34 (1988). The Supreme Court noted that "the decision to dismiss with or without prejudice was left to the guided discretion of the district court, and that neither remedy [dismissal with or without prejudice] was given priority." *Id.* at 335.

II.     **Analysis**

   A.  **CIPA**

This Court begins by assessing whether the Government appropriately handled the CIPA issues that arose in November 2023, because that context informs its analysis of the Government's simultaneous handling of its speedy trial obligations. From the discussion between the Court and the parties during the November 13, 2023, hearing, this Court understood that the parties would seek security clearances for defense counsel before commencing the CIPA process at Section 2, a pretrial conference where the parties would discuss the specific classified information sought. *See* ECF 188 at 61–62 (hearing transcript in which AUSA Zelinsky confirmed, "The Court has accurately summarized the situation. We apply for defense counsel for security clearance. The Government undergoes – as this Court knows, there are multiple stages to the CIPA process."). This Court confirmed that plan in its paperless order on November 21, 2024, directing the parties to "provide a status report on the security clearance process on or before May 21, 2024." ECF 185. Of course, all parties knew that the Maryland USAO could not guarantee whether the defense attorneys would be approved for security clearances. But all parties agreed that obtaining security clearances for defense counsel would be the first step in the multi-step CIPA proceedings.

Had the parties so requested, it may have been possible for the Section 2 CIPA conference (to consider matters relating to classified information that may arise) to take place before defense counsel received security clearances.[5] The parties certainly could have brought Defendants' seventeen discovery requests to this Court in late November, to discuss whether this Court believed

---

[5] To the extent that the Government believed that sections 2-4 of the CIPA process had already taken place in early 2023, it should have realized that the process needed to start from scratch in light of the November, 2023 defense requests for classified discovery. Or, at least, the Government should have asked the Court for clarification regarding how it intended to proceed.

those requests to fall within the scope of permissible discovery. But nobody did. This Court did not learn about any dispute over the relevance or scope of the requested discovery, or even the existence of the seventeen defense requests, until defense counsel filed their status reports months later, in late April, 2024.

Of course, at any time during the CIPA process, the Government is entitled to make a decision that the "national security cost" of its continued prosecution is too high. Typically, the Government would make that decision after the Court has made some determination about what classified discovery or trial evidence is required to protect the defendant's rights. Nothing about the CIPA procedures, however, removes the determination regarding what the "national security cost" will be from the Court's domain. In other words, the decisions about what discovery must be provided or what evidence is relevant at trial are, as always, made by the presiding judge, not the Maryland USAO or the NSD. Then, after those determinations have been made by the Court, the Government gets to make its own decision about whether to proceed with its original prosecution or potentially narrow its charges or its evidence in accordance with the Court's CIPA dictates, if it cannot convince the Court of a suitable non-classified way to proceed.

In this case, the Government flipped the process on its head. Before even asking the Court to opine on the relevance or scope of the seventeen defense requests (or even advising the Court that those requests existed), the Maryland USAO forwarded the requests to NSD. Sometime before February 22, 2024, the NSD opined that it did not deem the defense requests "relevant and discoverable," and it refused to even process the security clearance investigations that this Court had expressly contemplated. In other words, the NSD apparently determined that *any* "national security cost," even simply the time and expense of processing three applications for security

clearances, would be too much in this case, without even knowing what classified information this Court would order to be produced.

Of course, such a decision is within the purview of the NSD and comports with the balancing act that CIPA entails: informing the Government of the "national security cost" of the prosecution and allowing it to decide how best to proceed. *See United States v. Fernandez*, 887 F.2d 465, 469 (4th Cir. 1989) ("We agree with the Attorney General that CIPA envisions a single decisionmaker balancing the cost of national security disclosure against the cost of aborting a prosecution."). The NSD can certainly conclude that it is unwilling to pay any "national security cost." But once the Government decides that the "national security cost" set by the Court is too high, as it apparently did here, it does not simply get to proceed to trial under its own terms and reject the defense's requests for discovery. Strangely, instead of informing this Court of the NSD's decision, which would have triggered this Court's evaluation of whether the case could still proceed forward in light of the Defendants' rights to obtain certain evidence in discovery and present their defenses at trial, the Maryland USAO took it upon itself to jump to what appears to be a CIPA Section 4 or Section 6(c) substitution question, without any Court involvement. Put differently, the Maryland USAO decided to consult an expert witness who might be able to provide unclassified testimony at trial that might address one or two of Defendants' seventeen discovery requests. That unilateral decision to seek substitute evidence skipped over several sections of CIPA—there would be no way for this Court to determine whether the proposed expert testimony could be an adequate substitute for the requested classified information (at discovery or at trial) without first ascertaining what the classified information would have shown. More fundamentally, the Maryland USAO's proposed unclassified "medical espionage" expert, who is a university

professor, would not be an adequate substitute for all seventeen of the defense requests, some of which asked for information specific to this case.

Even more inexplicably, once the Maryland USAO disclosed the identity of its proposed expert witness, it did not retain that witness or provide a standard expert witness report, saying that they would do so "on a litigation timeline" to be set by the Court. Of course, because the Maryland USAO did not ever advise the Court that the Government had declined to participate in the CIPA process the Court envisioned, the Court could not set a trial date or a litigation timeline.[6]

In sum, the Government badly misconstrued its CIPA obligations. It conflated its undisputed ability to determine what classified information it was ultimately willing to produce in discovery with an ability to determine what discovery the defendants are legally entitled to receive. And, through its months-long silence, it divested this Court of any opportunity to control the timely progress of this case through the anticipated CIPA process.

### B. The Speedy Trial Act

This Court next must turn to the way in which the bungled CIPA process affected the Defendants' statutory speedy trial rights.

---

[6] In addition, this Court is perplexed by the Government's representation that it does not have any classified information that would contradict its proposed expert witness's opinion, given that the expert witness has not yet authored an opinion and the Government was unable, in court, to provide precise details regarding what the report would contain. *Compare* AUSA Zelinsky's representations at the May 6, 2024, in-court hearing, expressing some uncertainty regarding the precise boundaries of what the expert will say, including whether the expert will reference any declassified information, *with* ECF 194-4 at 1 (March 24, 2024, email from AUSA Zelinsky stating, "As we discussed we would produce information that contradicted our expert if we had it. We do not have such information and have no reason to believe it exists."). It seems plain that the Government cannot say with certainty whether any contradictory classified information exists at this stage and is unwilling to expend the effort to find out.

### 1.   Violation of the Speedy Trial Act

The threshold question, "was the Speedy Trial Act violated?" has a clear and unequivocal answer: "Yes." This is not a question about which this Court enjoys any discretion, as recently highlighted by the Fourth Circuit's ruling in *Hart*. In that case, the defendant, Kenneth Hart, operated a drug trafficking and prostitution ring involving the use of physical violence against his victims. 91 F.4th 732, 736 (4th Cir. 2024). When the government investigation started and one of his associates received a grand jury subpoena, Hart told her not to attend. *Id.* When she disobeyed, he physically assaulted her and threatened to kill her child. *Id.* The government charged Hart with witness tampering and he made his initial appearance in court on May 18, 2017. The Speedy Trial Act therefore required that Hart be indicted on or before June 17, 2017, thirty days from that initial appearance. 18 U.S.C. § 3161(b). Instead, however, the government filed a consent motion expressing the mutual interest of the parties "to delay the filing of an Indictment and the holding of a preliminary hearing to discuss the possibility of a resolution of this matter in advance of future proceedings." *Id.* The district court granted the parties' consent motion, finding no opposition and "good and sufficient cause." *Id.* When early plea negotiations failed, however, the government indicted Hart for witness tampering on July 17, 2017. *Id.*

Hart filed a pro se motion in advance of his trial, arguing that his speedy trial rights had been violated, including his right to be indicted within thirty days of his initial appearance. *Id.* at 737. On appeal after his eventual conviction, the Fourth Circuit agreed. In response to the government's argument that the short thirty-day delay should be excluded because it served the ends of justice, the Fourth Circuit noted:

> Under the Act, a court may exclude a period of delay if two things happen: (1) the "judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial" and (2) "the court sets forth, in the record of the case,

> either orally or in writing, its reasons for the findings." In other words, it first must
> be "clear from the record that the court conducted the mandatory balancing
> contemporaneously with the granting of the continuance." And, second, the court
> must set forth the reasons for its finding no later than when it rules on a defendant's
> motion to dismiss. If the district court fails to meet these requirements, then the
> delay is not excluded from the speedy trial clock.

91 F.4th at 739–40 (first quoting 18 U.S.C. § 3161(h)(7)(A) and *United States v. Smart*, 91 F.4th

214, 221 (4th Cir. 2024); then quoting *United States v. Keith*, 42 F.3d 234, 237 (4th Cir. 1994)).

With respect to the district court's Speedy Trial Act ruling, the *Hart* court found:

> But there is no evidence in the record that the district court contemporaneously
> conducted ends-of-justice balancing or ever set forth the reasons for that finding.
> The May 30 order did not mention an ends-of-justice finding. Neither did the
> consent motion. Instead, the order granted the continuance based on a lack of
> opposition and "good and sufficient cause." But the court never explained—and the
> motion never made plain—what good and sufficient cause means, nor why it
> existed. So based on the order and motion, we cannot determine whether the court
> contemporaneously conducted the ends-of-justice balancing.

*Id.* at 740 (internal citations omitted).

If the record in *Hart* was insufficient to show contemporaneous balancing and to comport

with the Speedy Trial Act, the record in this case cannot even come close. In *Hart,* the parties

submitted a consent motion asking the district court to make a speedy trial exclusion, the district

court considered and granted that motion, and the Fourth Circuit still found the exclusion

insufficient because its language failed to comply with the precise dictates of the Speedy Trial Act.

The fact that all parties in *Hart* had believed, in good faith, that the time had been properly

excluded did not dictate the outcome. In this case, while the Notice explained that both the defense

and the Government believed a speedy trial exclusion would be appropriate, the parties filed no

motion and did not formally ask the Court to make an exclusion of time. The Notice made cursory

reference to the Defendants' "belief that the ends of justice served by the granting of such

continuance outweigh the best interests of the public and the Defendants in a speedy trial," but

provided no explanation for why they held that belief or any proposed findings for the Court. And the Court accordingly made no "ends-of-justice" findings in the record.

The Government's attempt, then, to characterize the Notice as the "Defendant's Motion for Exclusion of Time Under the Speedy Trial Act," ECF 199 at 5, is unavailing. The parties had discussed, in emails, how the Government generally files a motion asking this Court to make "ends of justice" findings to exclude the six-month period from Speedy Trial Act calculations, but it simply neglected to do so here. *See* ECF 205-1 at 1–2 (Government email stating, "Ordinarily we do it is [sic] as a separate motion with a proposed order and findings.").While it is clear from the Notice that the Defendants intended to "waive" their speedy trial rights for a six-month period, the Speedy Trial Act requires a court finding that "the ends of justice served by the granting of the continuance outweigh the best interests **of the public** and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A) (emphasis added). The facts underlying the public's interests were not analyzed in the Notice, nor could the Defendants effectively "waive" those public interests.

In sum, this Court plainly did not conduct the mandatory balancing of whether the ends of justice served by the delay outweigh the best interests of the public and the Defendants in a speedy trial contemporaneously with its granting of the trial continuance in November, 2023. Nobody asked the Court to do so. Thus, contemporaneous balancing is not "clear from the record" and this Court cannot retroactively exclude the period of delay, as *Hart* and the plain language of the statute make clear.

It is worth noting that while this Court cannot say what its ruling on the "ends of justice" balancing would have been had the issue been presented in November, 2023, it can unequivocally say that, at present, the "ends of justice" were not served in any way by the six-month delay. Absolutely nothing productive has transpired since November, 2023 to advance this case towards

disposition (at least until this Court's recent hearing on May 6, 2024). Instead of asking that background checks commence, the Maryland USAO apparently asked the NSD to consider whether the defense discovery requests were "relevant" (or, at least, the NSD construed the request to seek its opinion on that issue). The NSD sat on the requests for weeks without action.[7] The Government ultimately decided to act as "judge and jury" regarding whether there were "relevant and discoverable records to which the defendant[s were] entitled," ECF 199 at 6, and to withhold its decision from this Court for two-and-a-half months. There are no steps of the CIPA process during which the NSD rules on the relevance or discoverability of defense requests for classified information.[8] The Government can certainly present relevance arguments to the Court during the pretrial conference at Section 2, or when arguing for exclusion of classified evidence during the *ex parte* submission at Section 4, but decisions about what evidence is relevant or discoverable are made by the Court, not DOJ. *See* U.S. Dep't of Just., Just. Manual § 9-90.210-B (2020) ("A request to the [NSD official] by a [US Attorney] for a search . . . for preexisting intelligence information

---

[7] The speedy trial responsibility lies with the entire U.S. Government as the charging agent, not just the Maryland USAO. As an example, in the constitutional speedy trial context, courts have concluded that even a delay occasioned by a judge's illness still counts as "institutional delay" and weighs against the government, though less heavily than other delays. *See United States v. Muhtorov,* 20 F.4th 558, 648 (10th Cir. 2021) (collecting cases). This Court recognizes its own participation in the statutory violation here, for failing to recognize that it had not been asked to make appropriate ends-of-justice findings at the time it postponed the retrial (it thought) to allow the security clearance investigations to commence. Any such contemporaneous finding, though, would have been premised on a false set of facts, because the Government never sent defense counsel the forms to start the background checks. It is also worth noting that the NSD is part of the U.S. Government as well. While it plays no direct role in the prosecution, when it stalls the forward progress of a criminal case, it is not exempt from blame for unnecessary "institutional" delay. And the Maryland USAO should have engaged in more frequent reminders to the NSD regarding the importance of prompt action to protect the Defendants' speedy trial rights.

[8] The NSD may determine "whether a search of [intelligence community] files is appropriate," U.S. Dep't of Just., Just. Manual § 9-90.210-C (2020), but that analysis does not substitute for the Court's independent determination of the prosecution's affirmative discovery obligations.

relevant to a criminal investigation or indictment . . . shall be undertaken only when there exist objective articulable facts justifying the conclusion that . . . there are documents or information within the intelligence community that fall reasonably within the scope of the prosecutor's affirmative discovery obligations to the defendant, as that scope has been defined **by the Federal courts**.") (emphasis added). In the end, the Government has failed to show that the delay it caused by mishandling the CIPA process advanced the "ends of justice," and this Court would decline to make a retroactive exclusion even had the required contemporaneous ends-of-justice findings been present. The Speedy Trial Act therefore mandates dismissal of the pending charges under 18 U.S.C. § 3162(a)(2).

### 2. Dismissal With or Without Prejudice

The more challenging question is whether the mandatory dismissal of these charges should be with or without prejudice. This Court considers the three relevant statutory factors below, in addition to considering whether the Defendants have suffered prejudice from the extended delay and the dismissal.

#### a. Seriousness of the Offense

The first factor involves the seriousness of the offenses charged. *Id.* § 3162(a)(1). Despite some of the rhetoric used during this prosecution, the Government has not charged these Defendants with any espionage, treason, or other national security offenses. The charges are limited to felony HIPAA violations, a conspiracy to commit felony HIPAA offenses, and two charges of identity theft against Dr. Gabrielian, which were added in a superseding indictment prior to the anticipated retrial.

The structure of the criminal HIPAA statute requires a finding that these are, for Speedy Trial Act purposes, serious offenses. The charged subsection of HIPAA carries a ten-year penalty

31

and is the most serious of the three levels of criminal violations in the statute. This Court therefore finds that the "seriousness of the offense" factor tips in favor of the Government and dismissal without prejudice.

### b. Facts and Circumstances Which Led to Dismissal

The second factor, by contrast, weighs heavily in favor of the Defendants and dismissal with prejudice. This Court, of course, is cognizant of the critical role the DOJ plays in balancing this country's national security interests with its interest in prosecuting criminal offenses. But the law is clear that criminal defendants do not sacrifice any of their rights to accommodate that balancing. And the duty of protecting Defendants' speedy trial rights rests on the Government's shoulders as the charging authority. *See* U.S. Dep't of Just., Just. Manual § 9-90.210-A (2020) ("The Federal [Law Enforcement Community] must carry out its mission in accordance with the provisions of the United States Constitution, case law, statutes, and rules of procedure and evidence. Its compliance with those constraints is continually monitored by the judicial branch."); *Dickey v. Florida*, 398 U.S. 30, 38 (1970) (noting that "the right to a prompt inquiry into criminal charges is fundamental and the duty of the charging authority is to provide a prompt trial").

In this case, this Court credits that the Maryland USAO genuinely held the mistaken impression that the defense Notice had excluded the six-month period from November, 2023 to May, 2024 from Speedy Trial Act calculations. That said, even an agreed exclusion of time does not provide the Government a license to neglect its obligation to provide Defendants a speedy trial. While the Speedy Trial Act allows certain windows of time to be excluded, all defendants retain a constitutional right guaranteed by the Sixth Amendment to a "speedy and public trial," with no

enumerated exclusions.[9] Here, this Court postponed the retrial and asked for a status update in six months, an extraordinarily long delay, only because all parties recognized that background investigations and CIPA processes take a long time. Had those factors been removed from the equation (or had the Court been informed when the Government removed them from the equation), this Court would not have agreed to continue the retrial for that lengthy period.

The Government displayed a serious pattern of neglect of its speedy trial obligations during the six months between November, 2023 and May, 2024. The record reflects that the Maryland USAO shipped the defense discovery requests off to the NSD and then left it entirely in its hands, without any regular efforts to press for a response or remind the NSD of the Government's statutory speedy trial obligations. The record also reflects that, once a defense inquiry in late January prompted the Maryland USAO to reach out again to NSD in early February, it apparently received instruction to conduct a brief call with defense counsel to get clarification about their seventeen requests. All of that could have happened immediately upon receipt of the defense requests in late November.

It is equally clear that sometime between February 5, 2024, and February 21, 2024, the NSD informed the Maryland USAO that it was unwilling to entertain a CIPA process. *See* ECF 199 at 6. That unilateral decision to bypass statutorily required procedures governing defense requests for classified materials compounded the Government's neglect of its speedy trial obligations and led to further unjustified delay. The Government did not come to the Court promptly to advise of the development and to seek next steps: Are there sufficient non-classified discovery alternatives to allow this case to proceed? Should a trial be scheduled now if no CIPA process will ensue?

---

[9] This Court has not evaluated this case under a constitutional speedy trial standard, or the factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), because Defendants' in-court motions only sought relief under the Speedy Trial Act.

Instead, the Government apparently took it upon itself to identify a potential expert witness not requested by the defense or approved by the Court. And as noted above, the Government did not retain the expert or ask the Court for a "litigation timeline" to govern production of an expert report. The Court had no knowledge that an expert witness was even being considered. In fact, had this Court not scheduled an in-court hearing upon its receipt of the defense's status reports, it is unclear when the Government would have advised the Court of these developments at all.[10] The Government's conduct during the past six months has evidenced a complete and utter abandonment of its obligation to bring this case to trial in an expeditious fashion.

To the extent the Government attempts to justify its dilatory conduct by its reliance on the Notice's "waiver" of a speedy trial, that justification is unpersuasive for multiple reasons. First, Defendants expressly conditioned their waiver on their expectations (based on this Court's directive and the Government's express representations) that the parties will "obtain security clearances as expeditiously as possible and to proceed in that manner pursuant to the Act's provisions." ECF 184. Defendants' understanding comported with this Court's: counsel would promptly fill out the security clearance paperwork and undergo background checks, because the CIPA process that the Court anticipated could not proceed until defense counsel had been cleared. At no time did this Court direct the Government to seek the NSD's opinion regarding what evidence is "relevant or discoverable" in this criminal case. In light of the divergence between the representations to this Court and defense counsel in November about what would occur and the events that actually transpired, any "waiver" on the part of Defendants rested on a false premise.

---

[10] It is true, of course, that the defense was equally capable of bringing these developments to this Court's attention in a more timely fashion. And the defense represented to the Government several times that it intended to do so, but then did not take action.  However, the obligation to provide a speedy trial and enforce the Speedy Trial Act rests with the Government, not the defense.

Second, as discussed above, Defendants' Notice and "waiver" was never approved by the Court or even presented to this Court in a manner seeking approval. It appears from the parties' email exchanges that each party believed the other would seek the required court findings. But as a result of the apparent misunderstanding, neither party did. A good faith misunderstanding, however, does not solve the problem described in *Hart*: a lack of contemporaneous ends-of-justice balancing, rendering any "waiver" ineffective. *See* 91 F.4th at 39–40.

Third, and most importantly, even had the waiver been valid and the six-month period been excluded, a speedy trial time exclusion does not vitiate the Government's obligation to proceed with haste in its prosecution. The Government is not supposed to simply "run out the clock" on the excluded time period before taking further steps to move the case forward.  And there is simply no justification for the pattern of neglect here, which included three separate unnecessary delays:

> 1) The Maryland USAO simply sent the discovery requests to the NSD and waited around for weeks and months for responses to arrive.
>
> 2) The Government knew in mid-February that it did not intend to process the attorney background checks required to allow this Court to conduct CIPA proceedings, but it did not inform this Court and instead sought to identify an expert witness without consulting the defense or this Court.
>
> 3) Once the Government identified its proposed expert witness in mid-March, the Government did not inform the Court that it was prepared to set the case for a litigation schedule and a trial. The Government filed nothing until just before this Court's status hearing on May 6, 2024.

The Government is supposed to be pressing the case forward expeditiously at all times, not waiting for the Defendants, the NSD, or the Court to take further action. The Supreme Court observed in *United States v. Taylor*, "[w]e do not dispute that a truly neglectful attitude on the part of the Government reasonably could be factored against it in a court's consideration" of whether to dismiss with or without prejudice. 487 U.S. 326, 338 (1988). Here, the pattern of neglect evidenced in the last six months (amounting to more than double the seventy-day period allowed

by the Speedy Trial Act) persuades this Court that the facts and circumstances resulting in the dismissal here weigh heavily in favor of dismissal with prejudice.

### c. Impact of Reprosecution on the Administration of the Speedy Trial Act and of Justice

The third statutory factor is perhaps the least clear and the most challenging to analyze. While it might appear that in every case in which the Government violates the Speedy Trial Act, the Court would want to deter future transgressions by dismissing the charges with prejudice, the Supreme Court has urged a more nuanced approach:

> It is self-evident that dismissal with prejudice always sends a stronger message than dismissal without prejudice, and is more likely to induce salutary changes in procedures, reducing pretrial delays. Nonetheless, the Act does not require dismissal with prejudice for every violation. Dismissal without prejudice is not a toothless sanction: it forces the Government to obtain a new indictment if it decides to reprosecute, and it exposes the prosecution to dismissal on statute of limitations grounds. Given the burdens borne by the prosecution and the effect of delay on the Government's ability to meet those burdens, substantial delay well may make reprosecution, even if permitted, unlikely. If the greater deterrent effect of barring reprosecution could alone support a decision to dismiss with prejudice, the consideration of the other factors identified in § 3162(a)(2) would be superfluous, and all violations would warrant barring reprosecution.

*Taylor*, 487 U.S. at 342. The Fourth Circuit, in fact, has explained that dismissal without prejudice is appropriate where "there is no evidence that a delay in the trial date was for the government to obtain a tactical advantage, that the delay was purposeful or that the [defendant] was prejudiced by the delay." *United States v. Jones*, 887 F.2d 492, 495 (4th Cir. 1989).

In this case, though, there are particular circumstances weighing in favor of dismissal with prejudice. First, while deterrence is not dispositive under this factor, it is a valid consideration. In this case dismissal without prejudice would be a toothless sanction to the Government: the second superseding indictment would be dismissed without prejudice, the Government would refile its charges (which are not time-barred), and the case would carry on. Because the evidence in this

case consists largely of six hours of videotaped meetings between the Defendants and an undercover agent, the Government's ability to meet its burden of proof will not be impacted by the delay. There would thus be no meaningful recourse to the Defendants for the violation of their statutory rights and no meaningful deterrent effect for the Government. The Speedy Trial Act loses all significance if the Government never suffers real consequences from its violation, even where, as here, it causes a lengthy and wholly unjustified delay.

Second, it cannot be said here, like in the *Jones* case, that there is "no evidence that a delay in the trial date was for the government to obtain a tactical advantage." 887 F.2d at 495. This Court, of course, does not find that the Government initially declined to start the CIPA process in order to obtain a tactical advantage. Instead, this Court assumes that the NSD made its decision to prioritize the protection of national security information over this felony HIPPA prosecution. But this Court is persuaded that, after the Government decided to deny the security clearances and effectively prevent any CIPA process, the Government attempted to put itself on better footing to proceed with the case once it eventually shared the news with the Court. At least during February, and March, 2024, it appears that the Government was identifying and consulting (but not retaining) an expert witness in the hopes of convincing the Court it had an adequate substitute for the classified information sought by the defense. That portion of the months-long delay, at least, was squarely for the purpose of obtaining a tactical advantage.

Third, as addressed in section "d" below, this Court finds that the Defendants suffered prejudice from this delay, which is another factor considered in *Jones*.

Finally, in this case, the impact of reprosecution on the Speedy Trial Act and on the administration of justice would be far greater than in an average criminal prosecution. The CIPA process, by definition and in practice, is complex and time-consuming. And the process of

obtaining multiple security clearances, once it begins, is months-long at best. This Court would not intend to defer to the NSD's determinations regarding the relevance and admissibility of the requested evidence. Instead, this Court is confident after reviewing the seventeen defense requests that at least some of those requests, in whole or in part, justify initiating the CIPA process and would require defense counsel to be cleared. Accordingly, unlike in many simpler cases, this Court cannot simply address the speedy trial issues by setting this case for an imminent retrial. A lengthy delay would be unavoidable.

While this Court does not attribute untoward delay to the Government for the fourteen months the Defendants spent on pretrial release between September, 2022 and the hearing in November, 2023, and would reasonably expect the Government to work diligently now through the security clearance and CIPA proceedings to get this case ready for retrial, adding the six wasted months to those fixed periods of pretrial delay would render the grand total untenable in terms of both the Defendants' speedy trial rights and the administration of justice. Defendants should not be forced to suffer the impacts of being under indictment for an extra six months in a case that 1) was already prolonged by an unanticipated hung jury and mistrial and 2) would need to be further prolonged to accomplish the procedures required to protect both the national security interests and the Defendants' rights to receive a fair trial. Government counsel, knowing that this is a case already extended by these inescapable circumstances, should have been especially diligent in advancing the matter towards its retrial. And they were not.

On May 6, 2024, the Government demonstrated the ease with which this whole situation could have been avoided. After the hearing where this Court heard the Defendants' speedy trial motions and expressed its grave concerns about the Government's handling of this matter, within mere hours, Government counsel advised this Court that security clearance applications had been

forwarded to defense counsel. ECF 200. Apparently, when told "the Court wants this to happen," the NSD quickly agreed that the security clearance process could commence, regardless of its assessment of whether the defense requests were "relevant and discoverable." But this Court wanted the lengthy process of background investigations to commence in November, 2023, not in May, 2024, and it cancelled the November, 2023 retrial on the assumption that the process would begin promptly. The Government's unilateral decision to interpose its own relevance determinations into the CIPA process seriously inhibited the speedy administration of justice in the venue where it should be administered, this Court. Accordingly, this Court finds the factor of "impact of reprosecution on the Speedy Trial Act and the administration of justice" also weighs in favor of the Defendants and dismissal with prejudice.

### d.  Prejudice to the Defendants

Lastly, this Court assesses whether the Defendants have been prejudiced by this delay. In the related context of a constitutional speedy trial analysis, the Supreme Court has identified three defense interests bearing on the question of whether a defendant has suffered prejudice: "oppressive pretrial incarceration," "anxiety and concern of the accused," and "the possibility that the . . . defense will be impaired." *Doggett v. United States*, 505 U.S. 647, 654 (1992) (quoting *Barker v. Wingo*, 407 U.S. 514 (1972)). Here, two of those three defense interests are not in play and would ordinarily suggest an absence of prejudice: Defendants have not been subject to any pretrial incarceration and have not suggested that their defense has been impaired by the mere fact of the delay.[11]

---

[11] Defendants have suggested that their defense has been impaired by the position the Government is taking with respect to CIPA, but that is a different inquiry that does not bear directly on the speedy trial question. At present, there is no reason to believe that the six-month unnecessary delay would render any evidence or witness testimony unavailable to Defendants, given that the evidence in the case is largely preserved on video.

The second defense interest, however, is very much present in this case: "the anxiety and concern suffered by the accused." *Id.* The Supreme Court has stated that this factor requires defendants to identify "any restraint on liberty, disruption of employment, strain on financial resources, [or] exposure to public obloquy" that is greater than that faced by "anyone openly subject to criminal investigation." *United States v. MacDonald*, 456 U.S. 1, 9 (1982). Here, these Defendants have been subject to stringent conditions of supervision since the time of their arrest in September, 2022. Initially, they were confined to their home on 24/7 electronic monitoring, preventing them from working or even performing routine tasks like transporting their children to school. As time passed, the Court entered orders, mostly but not always with Government consent, relaxing some of the conditions to allow additional freedoms, removing electronic monitoring in favor of a curfew requiring the Defendants to be in their homes for twelve hours per day, and eventually allowing the Defendants to seek and maintain employment under certain restrictive conditions. Even that modification, however, has not permitted the Defendants to find work, because they have been unable to overcome the effect of the other pretrial restrictions and the reputational damage inflicted by the unusual charges in this case. Recently, on April 26, 2024, Defendants filed another motion seeking to further modify their conditions of release, explaining:

Under Defendants' current conditions of release, they

> may interview for and accept employment as approved by Pretrial Services. If agreed to by Pretrial Services and if [the] prospective employer is given adequate notice of the nature of the pending charges, Pretrial Services is permitted to approve work that may require access to protected health information assuming adequate safeguards are in place

Defendants ask the Court to remove all restrictions on their ability to seek employment. As a matter of prudence, Defendants will continue to notify prospective employers about the pending charges, because any routine internet search will reveal the press coverage of the initial indictment and arrests. However, Pretrial's understandable caution about complying with a Court order requiring "adequate safeguards" about access to protected health information has resulted in

> delays and extra communication with prospective employers that Defendants believe have hampered their attempts to find work. . . Defendants have diligently complied with all conditions of release since September 2022, without any infractions. They have already spent nearly all of their personal resources and savings defending themselves. They are desperate to find work to provide for themselves and their two young children.

ECF 196 at 1–2 (internal citations omitted). Defendants, a married couple who have been effectively accused of a failed attempt at espionage in extensive press coverage though not formally in the indicted charges, have been unable to find work to support their family for a time already exceeding eighteen months. The "public obloquy" associated with this case has been far greater than that experienced by the average defendant, due to the nature of the charges and the extensive national media attention. And the disruption of employment and resulting strain on financial resources (in addition to the costs of this litigation which include those associated with a lengthy jury trial ending in mistrial) have caused substantial and extraordinary anxiety and concern, particularly in light of the fact that both adult members of Defendants' family are facing these charges together and have been subjected to the same delays.

The six wasted months resulting from the Government's conduct inevitably prolonged the prejudice to these Defendants. Assuming *arguendo* that the total time to complete the attorneys' background investigations and move through the entire CIPA process would be one year (an estimate that may be overly optimistic), had the security clearance requests been processed promptly in November, 2023, this case could have been retried in November, 2024. Now, the earliest possible retrial date using that same estimate would be May, 2025. Defendants would suffer the uncertainty, adverse employment effects, and public obloquy for six additional months as a result of the Government's dilatory conduct. This Court therefore concludes that Defendants have suffered significant prejudice, but ultimately weighs it as a neutral factor given the absence of a detrimental effect on the Defendants' ability to present their defense.

In sum, balancing the three statutory factors that determine whether a Speedy Trial dismissal should be with or without prejudice, plus the additional important factor of prejudice to the Defendants, this Court concludes that only one factor, the seriousness of the offense, weighs in the Government's favor. The other factors are either neutral or weigh convincingly on the side of dismissal with prejudice to prevent further harm to Defendants' rights, to protect the administration of justice, and to vindicate the important interests served by the Speedy Trial Act against Government neglect and disregard. Those other factors, therefore, outweigh the serious nature of the charged offenses. A separate order will issue dismissing the charges in this case with prejudice.


_____/s/_____
Stephanie A. Gallagher
United States District Judge
